AO 106 (Rev. 04/10)  Application for a Search Warrant

# UNITED STATES DISTRICT COURT

for the

District of New Mexico

FILED
United States District Court
Albuquerque, New Mexico

Mitchell R. Elfers
Clerk of Court

In the Matter of the Search of

*(Briefly describe the property to be searched
or identify the person by name and address)*

Gold 2002 Lexus four door sedan
with NM tag APAX36 bearing VIN
JTHBF30G225023029

)
)
)
)
)
)

Case No.   22-MR-951

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:
2002 Gold Lexus ES with NM tag APAX36 bearing VIN JTHBF30G225023029 located at A-Albuqerque Towing 305 Conchas SE, Albuquerque, NM 87123.

located in the _____ District of _____ New Mexico _____ , there is now concealed *(identify the person or describe the property to be seized)*:
See Attachment B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. 841(a)(1) | Possession with Intent to Distribute Controlled Substances |
| 18 U.S.C. 922(g) | Possession of a Firearm and Ammunition by a Convicted Felon |
| 18 U.S.C. 924(c) | Possession of a Firearm in Furtherance of a Drug Trafficking Crime |

The application is based on these facts:
See attached Affidavit

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Charles DuBois, ATF Special Agent
*Printed name and title*

Telephonically sworn and electronically

signed. Date: _____ 06/14/2022

_____
*Judge's signature*

City and state: Albuquerque, NM

Laura Fashing, U.S. Magistrate Judge
*Printed name and title*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

IN THE MATTER OF THE SEARCH OF:
2002 4-door Lexus ES bearing New Mexico
License APAX36, VIN JTHBF30G225023029

Case No. _____

22-MR-951

## AFFIDAVIT IN SUPPORT OF AN
## APPLICATION UNDER RULE 41 FOR A
## WARRANT TO SEARCH AND SEIZE

I, Charles Dubois, being first duly sworn, hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1.      I make this affidavit in support of an application under Rule 41 of the Federal

Rules of Criminal Procedure for a warrant to search the vehicle known as 2002 gold Lexus ES

bearing New Mexico plate APAX36, Vin number JTHBF30G225023029, located at A-

Albuquerque Towing, 305 Conchas Street SE, Albuquerque NM, 87123, hereinafter

"VEHICLE," further described in Attachment A, for the things described in Attachment B.

2.      I am a Special Agent with the Bureau of Alcohol, Tobacco, Firearms, and

Explosives (ATF), and have been since September of 2019.  I attended a 26-week ATF academy

in Glynco, Georgia.  Prior to employment by the ATF your affiant spent approximately twelve

(12) years employed by the City of Albuquerque Police Department. Three (3) of those years

were spent in the Internal Affairs Division conducting administrative investigations.

3.      In this capacity, your Affiant investigates violations of federal criminal statutes, to

include violation of federal firearms, explosives and arson laws, and has specifically investigated

violations related to subjects who are found to be in possession of illegal and altered firearms,

Hobbs Act robbery cases, carjacking cases, and other cases involving violent crime. Your affiant

has attended the Federal Law Enforcement Training Center where your affiant received training in multiple aspects related to firearms, arson and explosives.

4.      The statements contained in this affidavit are based, in part, on information provided by Special Agents and Task Force Officers of the ATF and other law enforcement officers; on conversations held with police officers; and on my background and experience as a Special Agent with the ATF and previous law enforcement.

5.      As a Special Agent with the ATF and my prior experience as a law enforcement officer, I have conducted physical surveillance, interviewed sources of information and Defendants, served search warrants and arrest warrants, investigated firearms and drug trafficking, and assisted on undercover firearms and narcotic investigations.

6.      I am an investigative, or law enforcement officer of the United States within the meaning of Title 18, United States Code, Section 2510 (7), in that I am an officer of the United States who is empowered by law to conduct investigations and make arrests for the offenses enumerated in Title 18, 21 and 26, United States Code.

7.      I have been involved in an ongoing investigation regarding the distribution of controlled substances, specifically fentanyl, by Roberto Jose FIGUEROA.  Since the investigation's inception, I, as well as other Special Agents and Task Force Officers with the Albuquerque Police Department, and law enforcement officials from other agencies have obtained information regarding the illegal drug trafficking activities of Roberto Jose FIGUEROA.

2

8.      I make this affidavit based upon my own personal knowledge, which is substantially derived from my participation in the investigation, as well as that of fellow agents and officers who have participated in the investigation.  In addition, I have developed information I believe to be reliable from additional sources including

    a.      Information provided by Task Force Officers ("ATF/TFO Victor
            Hernandez and DEA/TFO Thomas NOVICKI"), Special Agents ("SA"),
            and Intelligence Research Specialists (IRS) of the ATF, and other law
            enforcement officials ("agents"), including oral and written reports that I
            have received directly or indirectly from said investigators;

9.      This affidavit is intended to show only that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

## FEDERAL CHARGES RELEVANT TO THIS INVESTIGATION

10.      I believe there is probable cause that the SUBJECT has committed offenses involving violations of, *inter alia* :

    a.      21 U.S.C. § 841 – Distribution and possession with intent to distribute
            controlled substances;

    b.      18 U.S.C. § 924(c) – Possession of a Firearm in Furtherance of a Drug
            Trafficking Crime

    c.      18 U.S.C. § 922(g) – Possession of a Firearm and Ammunition by a
            Convicted Felon

## EVIDENCE SOUGHT DURING SEARCH

11.     Based on my training, experience and participation in this and in similar investigations, I believe that individuals involved in illegal trafficking of controlled substances often conceal evidence of their drug trafficking activities in their residences and businesses, or the residences of friends or relatives, and in surrounding areas to which they have ready access such as garages, carports and outbuildings. They also conceal evidence in vehicles, including vehicles outside of their residences and businesses, so that they have ready access to it and so that they can hide it from law enforcement, including law enforcement officers executing search warrants at their residences or businesses. Evidence also may be found in other areas to which a drug dealer has ready access, such as rented storage areas and safety deposit boxes, or buried underground on their property. This evidence, which is discussed in detail in the following paragraphs, includes controlled substances, paraphernalia for weighing, packaging and distributing controlled substances, other contraband, records, documents, as well as evidence of drug transactions, proceeds from drug sales, and valuables obtained from proceeds.

12.     Individuals involved in illegal drug trafficking of controlled substances often keep quantities of controlled substances on their person, in their residences, garages, outbuildings, storage areas, carports and yards, in their businesses, in the residences of friends or relatives, in their vehicles, in off-site storage facilities, and in other areas to which they have ready access.

13.     Individuals involved in drug dealing commonly use certain paraphernalia to package and prepare controlled substances for distribution. The paraphernalia includes, but is not limited to, packaging materials (such as plastic baggies, wrapping paper, cellophane,

4

condoms, and film canisters) and scales to weigh controlled substances. Drug dealers commonly store these items on their person, in their residences, in their businesses, in their residences of friends or relatives, in their vehicles, and in other areas to which they have ready access.

14.     Drug traffickers often maintain records of their transactions in a manner similar to the record keeping procedures of legitimate businesses. Even after the drugs are sold, documentary records are often maintained for long periods of time, even years, to memorialize past transactions, the status of accounts receivable and accounts payable, and the names and telephone numbers of suppliers, customers and co-conspirators. These records may be maintained on paper, in the form of business and personal ledgers and diaries, calendars, memoranda, pay/owe sheets, IOUs, miscellaneous notes, money orders, customer lists, and telephone address books. These records can reflect names, addresses and/or telephone numbers of associates and co-conspirators, the sale and purchase of controlled substances including precursors, customer lists, and amounts of money owed to the trafficker by customers and by the trafficker to his/her suppliers.

15.     Drug traffickers often travel domestically and internationally to facilitate their trafficking. Evidence of foreign and domestic travel by persons engaged in illegal drug trafficking includes travel itineraries, airline tickets, receipts, passports, and visas. These items are stored by drug dealers on their person or in their business, residences and surrounding garages, outbuildings, carports and yards, the residences of relatives and in cars. Many of these items are accessible via the internet and can be downloaded and saved on the computer or other

5

digital media and on storage media.

16.     Drug traffickers often use storage facilities for drugs and other items related to trafficking that are at a location away from their residences and businesses.  These off-site storage facilities are often commercial storage lockers and rooms.  These locations are often used to store or hide drugs, contraband, money and other valuables.  Drug traffickers often keep documents and other items tending to show the existence of other stored drugs, contraband, money and other valuables in areas such as storage facilities.  Those documents and other items include rental agreements, receipts, keys, notes and maps specifically concerning off-site storage rooms, lockers, and safety deposit boxes.  This evidence may be found on their person or in their businesses, residences and surrounding garages, outbuildings, carports and yards, the residences of friends or relatives, and cars.  This type of documentation can be stored on digital media and concealed virtually anywhere.

17.     Other evidence of transportation, ordering, possession and sale of drugs can include the following:  telephone bills to show numbers called by the drug dealers (and hence potential associates), overnight mail receipts, bank statements, deposit and withdrawal slips, savings books, investment statements, loan statements, other financial institution statements, and federal and state tax returns.  The above items are stored by drug dealers on their person or in their business, residences and surrounding garages, outbuildings, carports and yards, the residences of friends or relatives, and cars.  This type of documentation can be stored on digital media and concealed virtually anywhere.

6

18.     Drug traffickers usually sell their product for cash.  Because large quantities of drugs can sell for thousands of dollars at the wholesale level, dealers may have thousands of dollars in cash on hand both as proceeds of sales and to purchase supplies/inventory.  In addition, drug dealers often have other assets generated by their drug business, or purchased with cash earned, such as precious metals and stones, jewelry, real estate, vehicles, and other valuables.

19.     Individuals involved in drug dealing often try to legitimize these profits from the sale of drugs.  To accomplish this goal, drug traffickers may utilize foreign and/or domestic banking institutions and their attendant services, real estate and businesses, both real and fictitious.  They also try to secret, transfer and conceal the money by (a) placing assets in names other than their own to avoid detection while maintaining control, (b) laundering money through what appears to be a legitimate business or businesses, (c) hiding the money in their homes, safes and safety deposit boxes, and/or (d) using the money to buy assets which are difficult to trace.  This evidence is useful in a criminal prosecution, and it also is useful in identifying real and personal property that can be seized and forfeited by the government under existing laws.  Documentation concerning this type of activity can be stored on digital media and concealed virtually anywhere.

20.     Evidence of significant, unexplained income of drug dealers, or for the acquisition and concealment of money and assets of drug sales, can be found on banking and investment account statements, credit card account statements, canceled checks, money orders, deposit slips, check and savings books, business and personal ledgers, accounting records, safe deposit box

7

records and keys, federal and state tax records, rental receipts, rental agreements, utility bills, overnight mail receipts, telephone bills, loan statements records reflecting ownership of real or personal property (such as deeds of trust or vehicle registration, insurance, and ownership information), vehicle and property rental records, lease and purchase agreements, and canceled mail. These records can be maintained on paper, but also can be maintained as electronic data on computers and other digital media. The above items are typically kept by drug dealers on their person or in their businesses, residences and surrounding garages, outbuildings, carports, and yards, the residences of friends or relatives, and vehicles.

21.     The use of digital media, including smartphones, tablets, cellular phones, and digital devices, has become part of everyday life. This is also true for drug traffickers. Information stored in electronic form on all of the above devices can provide evidence of drug trafficking. Drug traffickers frequently use some or all of these devices to communicate with co-conspirators, customers, sources of supply, and others involved in the drug trade. These communications include, but are not limited to, phone calls, text messages, SMS (Short Message Service) messaging, MMS (Multimedia Messaging Service) messaging, social media posts and messaging, and smartphone application messaging services. Smartphones, tablets, cellular phones, and digital devices are frequently capable of storing messages, emails, social media communications, and communications made over smartphone applications. The content of these communications will often provide evidence of drug trafficking. Numbers stored on a telephone (such as Caller ID lists reflecting recently received calls, speed dial lists of names and/or

8

telephone numbers, and logs of outgoing and incoming calls) can provide evidence of who the drug dealer is calling, and thus the identity of potential associates.

22.     Drug traffickers often take, or cause to be taken, photographs and/or videos of themselves, their associates, their property and their drugs.  They usually maintain these photographs and/or videos on their person or in their businesses, residences or cars, on computers, or in the residences of friends or relatives.  Smartphones, tablets, cellular phones, digital cameras, and other digital devices, often have the capability to take still photos and videos and save them indefinitely on the device's storage medium. Drug traffickers frequently use these devices to take their photographs and videos.

23.     Drug traffickers often maintain firearms and ammunition on their person or in their homes, businesses or cars to protect themselves and their drugs and their drug profits.  They also may maintain indicia of firearms such as receipts for firearms and ammunition, boxes for firearms and ammunition, firearms cleaning supplies, and instruction manuals and other documentation for firearms and ammunition.

24.     I know that weapons (including rifles, shotguns, and handguns) are tools of the trade for drug traffickers, who often keep firearms in close proximity to themselves, and their product and proceeds, to protect them from other drug traffickers and law enforcement.

25.     Drug traffickers often conceal evidence of drug dealing in vehicles outside of their residences for ready access and to prevent detection and seizure by officers executing search warrants at their residences.  This evidence, which is discussed in detail in the preceding

9

paragraphs, includes controlled substances, indicia such as packing documents and electronic storage devices (and their contents,) evidence tending to show the distribution of drugs (such as IOUs, pay-owe sheets, ledgers, lists of names and numbers, telephone address books, etc.), digital devices such as cellular/mobile/smart telephones and tablets (and their contents), and counter-surveillance devices.

26.     Drug traffickers often utilize digital video surveillance systems. A digital video surveillance system is a surveillance system that is capable of capturing images, videos, and audio that can be compressed, stored or sent over communication networks. I know that it is common for digital surveillance systems to contain storage media that allow for 30 days or more of camera footage to be stored on the system. Digital video surveillance systems can be used for nearly any environment, including a commercial business or residence. I know that drug traffickers make use of video surveillance systems to monitor who is approaching their residence and assess whether the person presents a threat to the trafficker's drugs or drug proceeds. Drug traffickers also utilize surveillance equipment to obtain advance notice when law enforcement arrives to hide or destroy evidence of criminal activity. However, given the constant recording that occurs with a digital surveillance system, it is also common that the digital video surveillance system will also depict evidence of the residents' drug trafficking activities and conversations related to drug trafficking.

27.     Documents showing who owns, occupies, or controls the location being searched also show who is responsible for the items found on the vehicle, including contraband and other evidence seized.  Documents and items showing the identity of the persons owning, residing in

or controlling the area being searched include, but are not limited to, utility and telephone bills, canceled envelopes and correspondence, outgoing answering machine messages, tax returns, keys, deeds and mortgage receipts.  These documents may also be produced on computers, downloaded from online accounts or scanned into digital format and stored on computers and related digital media.

28.     The term "computer" includes all types of electronic, magnetic, optical, electrochemical, or other high speed data processing devices performing logical, arithmetic, or storage functions, including desktop computers, notebook computers, mobile phones, smartphones, tablets, server computers, and network hardware. The term "digital media" includes personal digital assistants (PDAs), smartphones, tablets, BlackBerry devices, iPhones, iPods, iPads, digital cameras, and cellular telephones.  The term "storage media" includes any physical object upon which electronic data can be recorded, such as hard disks, RAM, floppy disks, flash memory, CD-ROMs, and other magnetic or optical media or digital medium. Collectively, the terms "computer," "digital media," and "storage media" are referred to as "electronic media."

29.     A list of items agents seek authority to seize is in Attachment B.

### ELECTRONIC MEDIA AND FORENSIC ANALYSIS

30.     As described above and in Attachment B, this application seeks permission to search for evidence and records that might be found in the VEHICLE, in whatever form they are found.  Much of the evidence and records described in the paragraphs above, and in Attachment

11

B, can also be produced and/or stored on electronic media. For this reason, I submit that if a computer, digital medium, or storage medium is found in the VEHICLE, there is probable cause to believe those records will be stored on that computer, digital medium, or storage medium. Thus, the warrant applied for would authorize the seizure of electronic media or, potentially, the copying of electronically stored information, all under Rule 41(e)(2)(B).

31.     *Necessity of seizing or copying entire electronic media.* In most cases, a thorough search of a vehicle for information that might be stored on electronic media often requires the seizure of the physical electronic media and later off-site review consistent with the warrant. In lieu of removing electronic media from the vehicle, it is sometimes possible to make an image copy of electronic media. Generally speaking, imaging is the taking of a complete electronic picture of the computer's data, including all hidden sectors and deleted files. Either seizure or imaging is often necessary to ensure the accuracy and completeness of data recorded on the electronic media, and to prevent the loss of the data either from accidental or intentional destruction. This is true because of the following:

        a.  The time required for an examination. As noted above, not all evidence takes the form of documents and files that can be easily viewed on site. Analyzing evidence of how a computer has been used, what it has been used for, and who has used it requires considerable time, and taking that much time in the vehicle could be unreasonable. Electronic media can store a large volume of information. Reviewing that information for things described in the warrant can take weeks or

months, depending on the volume of data stored, and would be impractical and invasive to attempt on-site.

b.  Technical requirements.  Computers can be configured in several different ways, featuring a variety of different operating systems, application software, and configurations.  Therefore, searching them sometimes requires tools or knowledge that might not be present on the search site.  The vast array of computer hardware and software available makes it difficult to know before a search what tools or knowledge will be required to analyze the system and its data in the vehicle. However, taking the electronic media off-site and reviewing it in a controlled environment will allow its examination with the proper tools and knowledge.

c.  Variety of forms of electronic media.  Records sought under this warrant could be stored in a variety of electronic media formats that may require off-site reviewing with specialized forensic tools.

32.  *Nature of examination.*  Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit seizing, imaging, or otherwise copying electronic media that reasonably appear to contain some or all of the evidence described in the warrant, and would authorize a later review of the media or information consistent with the warrant.  The later review may require techniques, including but not limited to computer-assisted scans of the computer or entire medium, that might expose many parts of a hard drive to human inspection in order to determine whether it is evidence described by the warrant.

13

## **PROBABLE CAUSE**

33.    On May 31, 2022, at approximately 1523 hours, Albuquerque Police Department

Officer Alex Castellano observed two subjects[1] sitting in a gold-colored Lexus parked at 6720

Cochiti Rd SE, in Albuquerque, New Mexico. Officer Castellano frequently patrols this area and

has located several stolen vehicles from the exact location the gold Lexus was parked at.

34.    Officer Castellano has witnessed several hand-to-hand narcotic exchanges at this

address and knows who the residents of 6720 Cochiti are and the vehicles they drive and did not

recognize the gold Lexus as a vehicle that belongs to the residents of the Cochiti address.

Officer Castellano conducted a motor vehicle department query on the gold Lexus and learned

the plate that was displayed on the gold Lexus returned to a suspended license plate belonging to

a white colored Subaru.

35.    Officer Castellano exited his police vehicle and approached the gold Lexus.  A

male subject, who was later identified as Roberto Jose FIGUEROA, attempted to exit the driver

seat of the vehicle.  Officer Castellano identified himself as an Albuquerque Police Officer,

advised the subject to remain seated in the vehicle, and requested his identification.  FIGUEROA

provided a false name and date of birth.  When Officer Castellano requested identification,

FIGUEROA provided a fake Florida driver's license containing another false name.

---

[1] The passenger in the vehicle was a female (identified as D.D.) who was later released and not charged in connection to this investigation.

14

36.     Officer Castellano then placed FIGUEROA in handcuffs for concealing his

identity.  Officer Castellano then walked FIGUEROA back to his police car and conducted a pat

down for weapons.  During the pat down for weapons, Officer Castellano located a Smith &

Wesson handgun inside FIGUEROA's waistband bearing serial number FDA9764. A short time

later, FIGUEROA advised Officer Castellano he had felony warrants and his real name was

"Roberto Jose FIGUEROA," and to let the female go because she had nothing to do with

anything. Officer Castellano conducted a NCIC query on FIGUEROA and learned FIGUEROA

had two outstanding felony warrants.  An additional query was conducted on the firearm located

inside FIGUEROA's waistband and learned the firearm was reported stolen.

37.     Being that FIGUEROA was under arrest, his vehicle had to be inventoried prior to

being towed per APD policy. After arresting FIGUEROA, officers prepared to tow the vehicle.

Prior to towing the vehicle, Officers conducted an inventory search of the gold Lexus and

discovered several narcotics throughout the vehicle to include a backpack with more narcotics

and a large amount of money.  Officers immediately suspended their inventory search and

requested the vehicle be sealed and towed for Officer Castellano to obtain a search warrant for

the vehicle.

38.     The vehicle FIGUEROA occupied during the arrest was a gold 2002 Lexus

bearing NM plate APAX36 and VIN JTHBF30G225023029, which FIGUEROA claims to be

his.  The vehicle was sealed by APD evidence technicians and towed to A-Albuquerque Towing

located at 305 Conchas Street SE, Albuquerque, NM, 87123, pending a search warrant.

15

39.     On June 1, 2022, Officer Castellano contacted the Bureau of Alcohol, Tobacco,

Firearms and Explosives (ATF) and Special Agent (SA) Charles Dubois was assigned to do

follow-up investigation in this case.

40.     SA Dubois conducted a criminal history query on FIGUEROA and determined

FIGUEROA has several felony convictions. These convictions include but are not limited to the

following: Receiving or Transferring a Stolen Motor Vehicle, case D-202-CR-2014-03790, out

of the 2nd Judicial District Court Bernalillo County, NM; Commercial Burglary, Case D-202-CR-

2014-04701, out of the 2nd Judicial District Court Bernalillo County, NM; and Non-Residential

Burglary, D-1116-CR-2016-00671, out of the 11th Judicial District Court San Juan County, NM.

41.     APD personnel sought and obtained a state search warrant for the gold Lexus. The

following items were seized after the execution of the search warrant on the vehicle FIGUEROA

was driving:

    a.   Black Taurus 9mm handgun Model G3c, Serial number ACN744180, one black
        magazine containing four (4) 9mm rounds, and one (1) 9mm round chambered in
        the firearm;

    b.   8,742 suspected fentanyl pills (997.6 gross grams) (these pills have been
        submitted to the laboratory for analysis but the results have not yet been
        received);

    c.   green leafy substance (officers recognized it to be marijuana);

    d.   liquid methadone;

    e.   crushed Xanax pills;

    f.   additional Xanax pills;

    g.   measuring scale;

16

h.  pill pouches;

i.  two backpacks; and

j.  $10,970.00 dollars in U.S. currency.

42.     The cash, Xanax and fentanyl along with the paraphernalia were located in the black backpack.  The Black Taurus pistol was located inside the glove compartment inside the Lexus.  The marijuana was in the white and black backpack.

43.     On June 8, 2022, SA Dubois was notified two cellphones remained inside the gold Lexus ES, VIN number JTHBF30G225023029 (VEHICLE) that were not listed as items to be seized in Officer Castellano's state search warrant. The gold Lexus is still located at A-Albuquerque Towing 305 Conchas Street SE, Albuquerque NM, 87123.

44.     The firearms and ammunition were manufactured outside of the State of New Mexico therefore traveled in interstate commerce. A function check was conducted, and the firearms functioned as designed. SA Dubois sought and obtained a federal arrest warrant for FIGUEROA for a violation of 18 U.S.C. 922(g)(1), that being Felon in Possession of a Firearm and Ammunition.

45.     FIGUEROA was also in possession of 8,742 suspected fentanyl pills. These pills are described as small blue pills with the letter M on one side and the number 30 on the opposite side. This appearance is consistent with the fentanyl pills I have encountered numerous times in the past through my training and experience.

17

46.     Based on your Affiant's training and experience, your Affiant knows subjects that
conspire to distribute narcotics use cell phones to communicate and plan the actions of the
transaction and to communicate during the course of the transaction.

47.     Based on the statements of Officer Castellano during the execution of the state
search warrant advising two (2) cell phones were left inside the vehicle, your Affiant believes
evidence of the above-mentioned crimes to be in the vehicle.

## CONCLUSION

48.     I submit that this affidavit supports probable cause for a warrant to search the
VEHICLE described in Attachment A and seize the items described in Attachment B.

Respectfully submitted,

CHARLES DUBOIS
Special Agent
Bureau of Alcohol, Tobacco, Firearms, and
Explosives

Electronically signed and telephonically sworn
on June 14, 2022:

UNITED STATES MAGISTRATE JUDGE

18

## ATTACHMENT A

*Property to be searched*

The property to be searched is a 2002 gold Lexus four-door sedan ES, NM tag APAX36 bearing VIN JTHBF30G225023029, located at 305 Conchas street SE, Albuquerque NM, 87123 hereinafter "VEHICLE."

**ATTACHMENT B**

*Property to be seized*

All records, information, and evidence relating to violations of 21 U.S.C. § 841(a)(1), 21 U.S.C. § 846, 18 U.S.C. § 924(c), those violations involving **Roberto Jose FIGUEROA**, including:

1.  Controlled substances, including, but not limited to, methamphetamine, heroin, cocaine, and marijuana.

2.  Drug paraphernalia, including but not limited to, scales, packaging materials, items for packaging and handling drugs.

3.  Large amounts of currency, financial instruments, precious metals, jewelry and other items of value and/or proceeds of drug transactions.

4.  Any and all drug customer lists, drug records, dealers lists, or any notes containing the individual names of such persons, telephone numbers, addresses of these customers or dealers, and any corresponding records of accounts receivable, money paid or received, drugs supplied or received, or cash received to pay for controlled substances or intended to pay for controlled substances.

5.  Telephone and address books or notes containing telephone numbers and addresses of co-conspirators.

6.  Telephone toll records for homes and/or businesses owned or controlled by suspected co-conspirators, or other communication devices used by them and/or their drug trafficking associates.

7.  Messages, notes, correspondence, and/or communications between drug trafficking associates.

8.  Indications of ownership or control of said VEHICLE.

9.  Records, receipts, bank statements and records, money drafts, letters of credit, money orders and cashier's checks received, passbooks, bank checks, safe deposit box keys, vault keys, safes and other items evidencing the obtaining, secreting and/or concealment, and or expenditures of money.

10. Any and all financial or other instruments evidencing placement of assets in the names other than the names of the drug traffickers themselves.

11. Books, records, receipts, diaries, notes, ledgers, airline tickets, cashier's checks, money orders and other papers relating to the transportation, ordering, sale and distribution of controlled substances and the outstanding debts and collections from controlled substances that have been distributed.

12. Photographs or videos of the drug traffickers, their co-conspirators and the property and assets purchased with drug proceeds.

13. Other financial records, which may include airline ticket receipts, credit card receipts, rental car receipts and luggage tags reflecting points of travel.

14. Firearms and ammunition, including but not limited to handguns, rifles, shotguns and automatic weapons.

15. Digital video surveillance systems, including the associated storage media.

16. Any and all computers, digital media, and storage media that reasonably appear to contain some or all of the records, information, and/or evidence described in Attachment B.

As used above, the terms "records" and "information" includes all forms of creation or storage, including any form of computer, digital media, or storage media; any handmade form (such as writing); any mechanical form (such as printing or typing); and any photographic form (such as microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, or photocopies).

The term "digital media" includes personal digital assistants (PDAs), smartphones, tablets, BlackBerry devices, iPhones, iPods, iPads, digital cameras, and cellular telephones.

The term "storage media" includes any physical object upon which electronic data can be recorded, such as hard disks, RAM, floppy disks, flash memory, CD-ROMs, and other magnetic or optical media or digital medium.

The term "computer" includes all types of electronic, magnetic, optical, electrochemical, or other high speed data processing devices performing logical, arithmetic, or storage functions, including desktop computers, notebook computers, mobile phones, smartphones, tablets, server computers, and network hardware.

3